IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LE VAN HUNG, et al.,

Plaintiffs,

v.

LIBBY SCHAAF, et al.,

Defendants.

Case No. 19-cv-01436-CRB

**ORDER GRANTING PRELIMINARY INJUNCTION**

Plaintiffs are individuals who are currently experiencing homelessness and reside in an encampment in Union Point Park in Oakland, California ("the park"). Motion (dkt. 17) at 1. Defendants are the City of Oakland, the Oakland Department of Public Works, Oakland Major Libby Schaaf, and Oakland's Assistant to City Administrator, Joe DeVries (collectively, "Defendants"). Plaintiffs oppose the City's plan to "clean and clear" the park—that is, remove the homeless encampment. See Compl. (dkt. 1); accord Opp. at 1. Now before the Court is Plaintiffs' Motion for a Preliminary Injunction, see Motion. Defendants have filed an opposition, Opp. (dkt. 31), and Plaintiffs have, with the assistance of counsel, see Notices of Appearance (dkts. 29-30), filed a Reply, see Reply (dkt. 36).

The Court holds as follows. The parties are hereby referred to Magistrate Judge Ryu on the issues of (1) the City's voicemail policies and practices regarding the phone number listed in the Vacate Notices and (2) the City's policies regarding shelter "availability". The Court is hopeful that the parties can reach agreement on these issues. The Court further orders that, after the parties have reached resolution on the two above-listed issues, the City may clean and clear the park, provided that it fully complies with its stated policies,

set out in Exhibits A and B to the Dunlap Declaration (dkt. 31-2), including but not limited to providing a new Notice to Vacate at least 72 hours in advance, offering shelter beds residents to be evicted, providing notice and storage of any property collected in the clean and clear, and otherwise adhering to the City's policies as well as all representations made in its filings and at the April 19, 2019 hearing on this Motion.

## I. BACKGROUND

### A. Factual Background

Plaintiffs are four individuals who have lived at an encampment in Union Point Park's Eastern/Southern parking lot for varying numbers of months. Compl. at 4. Union Point Park is located at 2311 Embarcadero in Oakland, California. Opp. at 10. It opened in 2005 and is operated by the City of Oakland. Id. Situated along the waterfront, the park features a playground, sculpture, grass lawns, two parking lots, benches, restrooms, and barbeque facilities. Id. A number of small businesses and a middle school are located nearby. Id. at 10, 12.

Around 2012, homeless encampments began to appear in Union Point Park. Id. at 11. Neither party appears to know precisely how many individuals currently reside at Union Point Park. See Opp. at 14 ("Currently, the number of people at Union Point Park is unknown. Two small makeshift structures, debris and approximately 15 RVS remain in this lot."); Reply at 9 ("According to the City's count, well more than eight people resided in Union Point Park as of March 31, 2019, including residents in 15 RVs in the Southern/Eastern Lot.").

After several attempts to "clean and clear" Union Point Park in 2018, Defendants determined that the conditions remained hazardous to both park users and encampment residents, and decided to notice and enforce an encampment closure. Opp. at 14; DeVries Dec'l ¶ 29 (dkt. 31-1); Dunlap Dec'l Exh. H. On March 15, 2019, Defendants posted a notice to vacate the property ("Vacate Notice") at the Eastern/Southern parking lot where Plaintiffs reside. Dunlap Dec'l Exh. H. The Vacate Notice states that the site has been

deemed uninhabitable and directs all persons to "vacate this site and remove any personal belongings." Dunlap Dec'l Exh. C. It states that on the specified time and date, Public Works crews will remove and store any property left at the site. Id. It emphasizes that "property that is unsafe or hazardous to store will be immediately discarded." Id. It also lists a phone number to call with questions or concerns. Id.

Oakland has in place policies governing the closure of homeless encampments. Two of these policies are the Encampment Management Policy, Dunlap Dec'l Exh. A, and the Standard Operating Procedure. Id. Exh. B. The former discusses at a high level of generality the City's goals and strategies for addressing homelessness, id. Exh. A; the latter establishes the concrete steps the City says that it takes in "remov[ing] homeless encampments from the public right-of-way and on City owned property." Id. Exh. B at 1. The policies provide that when the City decides to clear a homeless encampment, it first posts a Vacate Notice at least 72 hours in advance of that action. Dunlap Dec'l ¶¶ 10-12; id. Exh. B at 3. The Standard Operating Procedure then sets out the following procedures:

> 5. The [Public Works Agency] PWA shall return to the site on the specified date to remove any belongings left at the encampment site, and request the assistance of the Oakland Police Department (OPD) if necessary.
> 6. City personnel shall not prevent occupants from retrieving their belongings before vacating the encampment site.
> 7. City personnel shall not confiscate or remove belongings from site when the occupant is present, absent reasonable belief that the belongings are an immediate threat to public health and safety or are evidence of crime or contraband.
> 8. PWA staff shall take photographs of the encampment site prior to the cleanup.
> 9. PWA staff shall immediately dispose of belongings that are considered to be clearly trash or are unsafe for storage, such as food or food wrappers, soiled items, or used personal hygiene items . . . .
> 10. PWA staff will collect, bag, and label personal belongings left at the site. "Notice of Collected Property" will be posted where the original "Notice to Vacate" was previously posted, and will contain the PWA Call Center telephone number . . . .
> 11. PWA shall itemize the belongings collected and include the location, date, and time of collection on the itemization form.
> 12. The collected belongings will be stored at PWA facility for at least ninety (90) days.

3

Dunlap Dec'l Exh. B at 2-3. The City also states that it offers shelter beds and resources to individuals in encampments prior to the closure. DeVries Dec'l ¶ 29.

Plaintiffs contend that the City does not comply with these policies. Reply at 7-10. They state that the voicemail belonging to the number provided on the Property Notice is "frequently full," and thus they are unable to leave a message to ask about the City's plans. Reply at 9. Plaintiffs also state that they were never contacted by City outreach workers or offered shelter beds. Reply at 7; Veta Dec'l ¶ 9 (dkt. 39); Burns Dec'l ¶ 5 (dkt. 43); Huffman Dec'l ¶ 6 (dkt. 41).

Plaintiffs also claim that, despite the City's policies to the contrary, the City has a "pattern and practice" of "on-site property destruction." Reply at 8; Miralle Dec'l ¶ 14 (dkt. 40); Johns Dec'l Exh. C (dkt. 37) (Ewing Dec'l). In declarations, Plaintiffs and other homeless Oakland residents report that "Oakland police and Department of Public Works often dispose[] of all property present, using machinery and a trash compactor." Reply at 10; Veta Dec'l ¶ 5; Burns Dec'l ¶ 3; Miralle Dec'l ¶ 14. They thus contend that, based on the City's past practices, the City will fail to follow its policies and destroy their property in the clean and clear the park at issue here. Plaintiffs also contend that the City does not follow its practices after clearing an encampment, because the City "does not post the Notice of Collected Property at the site of the cleared encampment." Reply at 9; Veta Dec'l ¶ 6.

On March 15, 2019, the City of Oakland's Public Works Department informed Plaintiffs, through a posted notice, that on March 20, 2019, it would close the encampment and remove and store property left at the site at the time of cleanup. Dunlap Dec'l. Exh. J.

### B. Procedural Background

On March 19, 2019—one day before the City's proposed closure of the park, Plaintiffs filed the instant case and both a Motion for a Temporary Restraining Order and the instant Motion for a Preliminary Injunction. Compl. at 3. Plaintiffs claim that the contemplated closure would violate their Eighth and Fourteenth Amendment rights. See

4

1  Reply at 2. On March 19, 2019, the Court granted a temporary restraining order ("TRO")
2  enjoining Defendants from carrying out the closure until April 2, 2019. TRO Order (dkt.
3  18).

4  Defendants initially began the planned clean and clear on March 19. Opp. at 14.
5  They allege that the crews were unaware of the TRO. Id. When Defendants learned of the
6  Court's order, they ceased all work on the closure. Id. at 14-15. No individuals were
7  arrested or cited and no property was taken for storage or discarded during the aborted
8  operation. Id. at 15.

9  The Court held a hearing on the instant Motion on April 19, 2019. At that hearing,
10 the parties informed the Court that, although the TRO had expired on April 9, 2019—ten
11 days prior to the hearing—Defendants had agreed to follow the terms of the TRO until this
12 Court had issued its decision on the Motion for a Preliminary Injunction. See Minute Entry
13 (dkt. 44).

## II. DISCUSSION

A preliminary injunction should issue where the plaintiff establishes that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." See Rodriguez v. Robbins, 715 F.3d 1127, 1133 (9th Cir. 2013). The Ninth Circuit has adopted a "sliding scale approach" such that "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011). The "[l]ikelihood of success on the merits 'is the most important' Winter factor; if a movant fails to meet this 'threshold inquiry,' the court need not consider the other factors." Disney Enterprises, Inc. v. VidAngel, Inc., 869 F.3d 848, 856 (9th Cir. 2017). Moreover, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is

5

less complete than in a trial on the merits." Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981).

### A. Likelihood of Success on the Merits

Plaintiffs rely primarily on two recent Ninth Circuit cases, Lavan v. City of Los Angeles, 693 F.3d 1022 (9th.Cir. 2012), and Martin v. City of Boise, 902 F.3d 1031 (9th Cir. 2018), amended and superseded on denial of reh'g, 2019 WL 1434046 (Apr. 1, 2019). In Lavan, the Ninth Circuit held that the Fourteenth Amendment's Due Process Clause "protect[s] homeless persons from government seizure and summary destruction of their unabandoned, but momentarily unattended, personal property." 693 F.3d at 1024. Martin held that "the Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter." 902 F.3d at 1048.

Building on these cases, Plaintiffs argue that the proposed clean and clear would: (1) violate the Fourteenth Amendment because the City does not provide adequate notice and has a practice of destroying property on site and (2) would violate the Eighth Amendment because it carries a risk that they will be arrested in violation of Lavan. Reply at 5-13.

The Court addresses these claims individually.

#### 1. Eighth Amendment

The Eighth Amendment's bar against cruel and unusual punishments "circumscribes the criminal process in three ways." Ingraham v. Wright, 430 U.S. 651, 667 (1977). "First, it limits the type of punishment the government may impose; second, it proscribes punishment "grossly disproportionate" to the severity of the crime; and third, it places substantive limits on what the government may criminalize." Martin, 902 F.3d at 1046. Applying this standard to a Boise city ordinance that made it a misdemeanor to use "any of the streets, sidewalks, parks, or public places as a camping place at any time," the Ninth Circuit reached the "narrow" holding that "so long as there is a greater number of homeless individuals in [a jurisdiction] than the number of available beds [in shelters]," the

jurisdiction cannot prosecute homeless individuals for 'involuntarily sitting, lying, and sleeping in public.' That is, as long as there is no option of sleeping indoors, the government cannot criminalize indigent, homeless people for sleeping outdoors, on public property, on the false premise they had a choice in the matter." Martin, 902 F.3d at 1048 (quoting Jones v. City of Los Angeles, 444 F.3d 1118, 1138 (9th Cir. 2006), vacated, 505 F.3d 1006 (9th Cir. 2007) (alterations in original)). However, the Ninth Circuit also cautioned that Martin "in no way dictate[d] to the City that it must provide sufficient shelter for the homeless, or allow anyone who wishes to sit, lie, or sleep on the streets . . . at any time and at any place." Id. (quoting Jones, 444 F.3d at 1138 (second alteration in original)).

Plaintiffs argue that they are likely to succeed on the merits of their Eighth Amendment claim under Martin because (1) Oakland has insufficient beds for its residents that are currently experiencing homelessness and (2) "[t]he currently contemplated closure threatens plaintiffs with prosecution for their involuntary act of residing in public." Reply at 5-6.

Assuming favorably for Plaintiffs that they are correct about the availability of Oakland's shelter beds, they are still unlikely to succeed on the merits of this claim. And that is so for the simple reason that a clean and clear of the park does not require the arrest of Plaintiffs—or, indeed of any homeless person residing at the park. As Judge Gilliam explained in a case in which plaintiffs experiencing homelessness in Oakland sought to enjoin a clean and clear of a different homeless encampment in Oakland:

> Plaintiffs are not faced with punishment for acts inherent to their unhoused status that they cannot control . . . . Plaintiffs' theory would therefore require the Court to extend the right described in Martin well beyond the parameters set by the Ninth Circuit. Martin does not establish a constitutional right to occupy public property indefinitely at Plaintiffs' option.

Miralle v. City of Oakland, 2018 WL 6199929, at *2 (N.D. Cal. Nov. 28, 2018); see also Sullivan v. City of Berkeley, 2017 WL 4922614, at *4 (N.D. Cal. Oct. 31, 2017) (holding that plaintiffs were unlikely to succeed on the merits of their claim that being moved from

7

1  BART property would violate the Eighth Amendment because BART was entitled to
2  enforce trespass laws on its property).

3　　　　The Court is fully persuaded by the reasoning of Miralle and Sullivan: while Martin limits localities' ability to arrest their homeless residents for the act of living in the streets when there is nowhere else for them to go, it does create a right for homeless residents to occupy indefinitely any public space of their choosing. See Miralle, 2018 WL 6199929, at *2; Sullivan, 2017 WL 4922614, at *4. The Court therefore concludes that Plaintiffs have not shown a likelihood of success on the merits of their Eighth Amendment claim. See Rodriguez, 715 F.3d at 1133.

### 2.　　Fourteenth Amendment Procedural Due Process

Plaintiffs' other argument arises under the Fourteenth Amendment's Procedural Due Process Clause. The Ninth Circuit has held that a person experiencing homelessness does not abandon her property by leaving it on the sidewalk, and thus that property is protected by the Due Process Clause. Lavan, 693 F.3d at 1031. So, "[b]ecause homeless persons' unabandoned possessions are 'property' within the meaning of the Fourteenth Amendment, the City must comport with the requirements of the Fourteenth Amendment's due process clause if it wishes to take and destroy them." Id. at 1032. Lavan held that Los Angeles' policy of seizing and destroying property created a likelihood of success on the merits because the "City's practice of on-the-spot destruction of seized property presents an enormous risk of erroneous deprivation, which could likely be mitigated by certain safeguards such as adequate notice and a meaningful opportunity to be heard." Id. at 1032-33 (internal citation and alteration omitted).

In Miralle, the plaintiffs argued that Oakland had a "'pattern and practice of unlawfully seizing and destroying property during the process of clearing homeless encampments." 2018 WL 6199929, at *3. Judge Gilliam was unpersuaded, because Oakland's "Standard Operating Procedure provides adequate notice and opportunity for Plaintiffs to be heard before property is seized." Id. While Judge Gilliam recognized that

the some plaintiffs reported that the City had destroyed their property in violation of that policy, he concluded that "given the City's representation that it will follow its stated procedures, and the notice already provided by the City," as well as the City's representation to the court "that it will follow its stated procedures," plaintiffs were not likely to succeed on the merits of their Due Process claim. Id. However, he noted that the practices that the plaintiffs alleged, "if carried out at [the encampment at issue], would raise serious questions with respect to Plaintiffs' still-pending Fourteenth Amendment claims." Id. He thus ordered that "[s]hould the City choose to renew its efforts to remove Plaintiffs from the [] site, it must provide a new notice to vacate and otherwise comply with all of its Policies and Procedures, including by providing the new notice at least 72 hours in advance, offering shelter beds to each of the 13 [site's] residents evicted, providing notice and storage of collected property, and otherwise adhering to all representations made in its filings and at the [preliminary injunction] hearing." Miralle, 2018 WL 6199929, at *4.

Plaintiffs now contend that the City did, in fact, seize and destroy property at that encampment in violation of both the City's Standard Operating Procedure and the representations that the City made before Judge Gilliam. Reply at 8-10. They thus urge that the same result is likely here. Id.

Plaintiffs also argue that the notice the City has provided was inadequate. Reply at 8-9. The City posted only one Vacate Notice, on March 15, 2019. Dunlap Dec'l Exh. C. The notice lists a phone number for anyone who has "any questions and/or concerns." Id. Plaintiffs argue that the phone number listed on the Notice to Vacate "leads to a voicemail that is frequently full," and the Notice provides no other method to access information about how to retrieve collected property. Reply at 8-9. They also allege that the City does not follow its policy of putting up a Notice of Collected Property after cleaning and clearing an encampment to alert former residents how to retrieve their belongings. Reply at 9; Veta Dec'l ¶ 6. Instead, they argue, the City's practice is to "dispose[] of all property present, using machinery and a trash compactor." Reply at 10; Veta Dec'l ¶ 5; Burns Dec'l

¶ 3; Miralle Dec'l ¶ 14.

The Court agrees with Plaintiffs that, as Judge Gilliam put it, if the City does behave as Plaintiffs allege, rather than complying with its policies, that behavior "would raise serious questions with respect to Plaintiffs' still-pending Fourteenth Amendment claims." Miralle, 2018 WL 6199929, at *3. The Court thus concludes that Plaintiffs have shown a likelihood of success on the merits of their due process claim if the City cleans and clears the encampment at the park without complying with its existing policies. See Dunlap Dec'l Exh. A, B; see also Lavan, 693 F.3d at 1032 ("Because homeless persons' unabandoned possessions are 'property' within the meaning of the Fourteenth Amendment, the City must comport with the requirements of the Fourteenth Amendment's due process clause if it wishes to take and destroy them.").[1]

Plaintiffs also urge, however, that the policies, even if complied with, are not constitutionally adequate because the only notice posted is the one-page Vacate Notice, which does not provide a meaningful notice opportunity because the voicemail the phone number leads to is frequently full. Reply at 9. The City's stated policy does not explain whether or how often the voicemail is checked or emptied, or whether the phone line the Vacate Notice connects to is operated by a City employee, or during what hours it is operated. See Dunlap Dec'l Exh. A, B. The parties dispute what the phone line policy is and whether it is adequate. See Reply at 9; Opp at 21-22.

The parties also dispute whether there is adequate shelter space available to park residents. See Reply at 5; Opp. at 19. They appear to dispute both the number of available

---

[1] In their Reply, for the first time, Plaintiffs argue for the first time that the clean and clear would violate the Fourteenth Amendment's Substantive Due Process Clause, in addition to the Procedural Due Process Clause, because the City would be "deliberately indifferent" to the dangers it would create to Plaintiffs by forcing them from the relative safety of the encampment. Reply at 11-13; cf. Sanchez v. City of Fresno, 914 F. Supp. 2d 1079, 1102 (E.D. Cal. 2012). The Court takes no view of the merits of this argument, and need not, because the Court follows "'[t]he general rule . . . that [parties] cannot raise a new issue for the first time in their reply briefs." State of Nev. v. Watkins, 914 F.2d 1545, 1560 (9th Cir. 1990) (United States v. Birtle, 792 F.2d 846, 848 (9th Cir. 1986) (first and second alterations in original)); see also U.S. ex rel. Giles v. Sardie, 191 F. Supp. 2d 1117, 1127 (C.D. Cal. 2000) ("It is improper for a moving party to introduce new facts or different legal arguments in the reply brief than those presented in the moving papers.").

beds in the shelters and what it means for a shelter to be "available"—Plaintiffs contend that Oakland's shelter policy means that the shelter space is functionally unavailable because it would mean Plaintiffs would have to abandon the majority of their belongings and even their pets to access only a short-term shelter stay. See Reply at 5 n.6.

As the Court discussed with the parties at the hearing on April 19, 2019, the Court directs the parties to seek the assistance of Judge Ryu as to (1) the Vacate Notice policies and (2) shelter availability policies. The Court is hopeful the parties can reach resolution on these issues.

### B. Irreparable Harm

Having cleared the "most important" preliminary injunction factor, see Disney Enterprises, Inc., 869 F.3d at 856, Plaintiffs easily satisfy the next factor: irreparable harm. See Rodriguez, 715 F.3d at 1144. Even if the loss of a home and one's property were not an irreparable harm—and the City does not appear to contest that it would be, see Opp. at 25-26—the Ninth Circuit has held that "an alleged constitutional infringement will often alone constitute irreparable harm." Monterey Mech. Co. v. Wilson, 125 F.3d 702, 715 (9th Cir. 1997) (quoting Associated General Contractors v. Coalition For Economic Equity, 950 F.2d, 1401, 1412 (9th Cir. 1991)). If the City is allowed to clear the encampment in noncompliance with its policies, see Dunlap Dec'l Exhs. A, B, and destroy Plaintiffs' property, as Plaintiffs allege, Plaintiffs would suffer irreparable harm.

### C. Balance of Equities

Plaintiffs argue that the balance of the equities tip in their favor because, while they recognize that the City has an interest in "preserving the park, protecting children walking to school, preventing crime, and catering to local businesses," it has not "demonstrate[d] that the removal of this homeless encampment meets these interests," or that "children feel unsafe, let alone are unsafe, walking to school." Reply at 13-14. The Court is mindful of the City's interests in ensuring that all residents have full and safe use of the park and

11

surrounding area. However, the balance of the equities tips of favor of Plaintiffs: they risk losing not only their homes and sources of safety, but their community and their possessions if the City cleans and clears the park without complying with its policies.

### D. Public Interest

As to the final Winter factor, the City urges that it "must not be prevented from exercising its municipal authority to close the encampment, clean and clear the lot, abate hazardous conditions, and restore health and safety to the community." Opp. at 26-27. But nothing about the preliminary injunction order Plaintiffs seek prevents the City from cleaning and clearing the area or "abat[ing] hazardous conditions," id. The City does not contend that clearing the park is the only manner in which it can seek to address the health and safety of the community. See Opp. at 26-27. Moreover, of course, the residents of the park are members of the community, and their interests, too, must be included in assessing the public interest. Nor does the Court's order prevent the City from cleaning the park in compliance with its policies, see Dunlap Dec'l Exh. A, B, once the parties have reached resolution on the two subsidiary issues of the City's phone policies and shelter availability with Judge Ryu. The Court thus finds that the public interest weighs in Plaintiffs' favor.

### III. CONCLUSION

For the foregoing reasons, the Court concludes that the Plaintiffs have met their burden to show that a preliminary injunction should issue to enjoin the City from clearing the park in a manner that violates its stated policies. The Court thus orders as follows:

The parties are referred to Judge Ryu on the issues of (1) the City's voicemail policies and practices regarding the phone number listed in the Vacate Notices and (2) the City's policies regarding shelter "availability". The Court is hopeful that the parties can reach agreement on these issues.

The Court further orders that, after the parties have reached resolution on the two above-listed issues, the City may clean and clear the park, provided that it fully complies

with its stated policies, including but not limited to providing a new Notice to Vacate at least 72 hours in advance, offering shelter beds residents to be evicted, providing notice and storage of any property collected in the clean and clear, and otherwise adhering to the City's policies, set out in Exhibits A and B to the Dunlap Declaration (dkt. 31-2), as well as all representations made in its filings and at the April 19, 2019 hearing on this Motion.

**IT IS SO ORDERED.**

Dated: April 23, 2019



CHARLES R. BREYER
United States District Judge